Filed 3/24/22  P. v. Conway CA6
Opinion following transfer from Supreme Court
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SCOTT MICHAEL CONWAY, JR.,<br><br>    Defendant and Appellant. | H044790<br>(Santa Clara County<br>Super. Ct. No. C1484487) |

Defendant Scott Michael Conway, Jr., appeals from a judgment entered after a jury found him guilty of attempted murder (Pen. Code, §§ 664, 187; count 4),[1] two counts of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); counts 2, 5), and active participation in a criminal street gang (§ 186.22, subd. (a); count 3).  The jury also found true gang enhancement allegations under section 186.22, subdivision (b)(1) on the attempted murder and assault counts.

Defendant originally contended:  (1) the jury instructions on murder and attempted murder misled the jury on the necessary mental state for attempted murder; (2) the prosecutor committed misconduct when he misstated the elements of attempted murder during argument; (3) the trial court erred when it removed a juror without good cause; (4) the trial court erred when it instructed the jury that it could consider the certainty of the eyewitnesses who identified him; (5) the trial court erred when it denied his mistrial motion; and (6) due process requires that various fines and fees be

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

subject to a determination of an ability to pay. Defendant subsequently filed a supplemental opening brief in which he contended that three new laws, which took effect on January 1, 2022, apply to him and require reversal of the judgment. We reject his original contentions, but we find that the new laws apply to him and necessitate a remand. Accordingly, we reverse the judgment.

## I.  PROCEDURAL BACKGROUND

Defendant and his codefendants, Jacob Lynch and Clemente Salas, were charged in a first amended information with murder (§ 187; count 1), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), and active participation in a criminal street gang (§ 186.22, subd. (a); count 3).[2] Defendant was also charged with additional crimes stemming from two separate incidents: attempted murder (§§ 664, 187; count 4); and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 5). The amended information further alleged that counts 1, 2, 4, and 5 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)).

The jury acquitted defendant of murder, but convicted him of attempted murder, two counts of assault by means of force likely to produce great bodily injury, and one count of active gang participation.[3] The jury also found true the gang enhancement allegations. The trial court sentenced defendant to an aggregate term of 21 years in state prison, which included 12 years for the gang enhancements. The court stayed under section 654 the mitigated term it imposed for the active participation count.

---

[2] Angel Lamas, James Conklin, Ruben Becerra, Javier Hernandez, and Joe Chavarria were also originally charged as codefendants. They pleaded guilty or no contest to manslaughter prior to trial. Lamas, Conklin, and Becerra testified for the prosecution.

[3] Lynch and Salas were convicted of murder.

## I. THE PROSECUTION'S CASE

### A. *Assault on Nestor Jimenez* (*Count 5*)

At approximately 7:00 p.m. on March 10, 2012, Nestor Jimenez rode his bike to the Chaparral Supermarket. When he left the store, it was dark. As he walked towards his bike, he saw a "tall, thin, and white-skinned" person leaning against the store wall. Jimenez identified defendant as this individual in a photo lineup and in court. There was another man, who was average height and "dark-skinned," standing next to Jimenez's bike.

Defendant mentioned that Jimenez had a blue bike and asked him if he was "a scrap." Jimenez understood that defendant was asking if he was a Sureño. He told defendant that he was not a gang member. As Jimenez tried to go back into the store, defendant and the other man began hitting his face with their fists. Each of them took turns holding Jimenez by his backpack while the other hit him repeatedly. When Jimenez tried to get away, the other man threw him to the ground. As Jimenez tried to stand up, defendant kicked him in the face and the other man hit his head with a scooter. They also grabbed his backpack and dragged him on the ground.

After about five minutes, Guillermo Carrzana, the owner of the store, heard the noise from the fight and came outside. Carrzana saw Jimenez, who was bleeding heavily, on the ground. When Carrzana yelled at defendant and the other assailant, they stopped hitting Jimenez and ran away. Carrzana brought Jimenez into the store. Shortly thereafter, an ambulance arrived and took Jimenez to the hospital. He suffered lacerations to his head and face, a broken nose, swelling on his arm, and injuries to his left eye. Jimenez has permanent partial vision loss in his left eye due to the assault.

### B. *Attempted Murder of Walter Romero* (*Count 4*)

At approximately 3:00 p.m. on April 8, 2012, 17-year-old Walter Romero returned home. About 30 to 40 minutes later, he decided to go back outside to smoke some marijuana. He went to an area near his home and smoked half a joint. As he

was walking home, four males and one female approached him. The group consisted of two African American males, a Hispanic male and female, and defendant. Romero recognized defendant based on a prior encounter.[4] Defendant asked Romero if he "banged," which Romero interpreted as asking whether he was in a gang. Romero responded that he was not a gang member. Defendant also told Romero that he "looked like a scrap," which Romero interpreted to mean that he looked like a Southerner or Sureño gang member. Romero told him that he was not a member of the Sureño gang. Defendant told Romero that he, defendant, was from the Roosevelt Park Locos (RPL) and "this is Norte." Romero kept repeating that he was not a gang member.

Defendant grabbed a skateboard and tried to hit Romero, who ducked and started running. Defendant and his companions chased Romero, and one of them eventually tackled him. Though he tried to cover himself, they hit him for one or two minutes. After they left, Romero stood up, and there was blood everywhere. At that point, Romero realized that he had been stabbed. Since defendant and the other assailants ran toward Romero's house, he went in the opposite direction to get help. He encountered two friends who eventually took him home. Romero's older brother called an ambulance and the police.

Romero was taken to a hospital where he stayed for four or five days. He had been stabbed three times in his chest and once in his left arm. The stab wounds to his chest caused both of his lungs to collapse. Without medical intervention, Romero

---

[4] About three to four months before the April incident, defendant followed Romero as he and a friend were walking home from school. Romero began walking faster to avoid him. When they arrived at his friend's house, defendant and some other people were already there. Defendant asked if he banged. Romero replied that he did not. Defendant swung at Romero and hit his face. Romero ran and was able to get away.

would have died.  Aside from the stab wounds, there was no evidence that he was beaten.

### C.  *Murder of Heriberto Reyes and Assault on Juan Reyes, Jr.* (*Counts 1, 2*)

Juan Reyes Sanchez, Sr. (Reyes) was the father of 14-year-old Heriberto Reyes (Heriberto) and Juan Reyes, Jr. (Juan).  After work on April 27, 2012, Reyes, his sons, his brother, Gustavo Reyes (Gustavo), his nephew, Luis Noriega (Noriega), and his friends, Augustin Cervantes (Cervantes) and Arturo Larios (Larios), went to Roosevelt Park to play basketball.  When they arrived, Heriberto, Juan, and Noriega went to the basketball courts while Reyes and Cervantes remained in the parking lot where they talked for about five or 10 minutes.  Gustavo was shooting baskets when Juan, Heriberto, Noriega, and Larios arrived at the basketball court.  While they waited for others to arrive, several men, who were between 18 and 24 years old, approached them.  Three to five men confronted Heriberto.  One of them asked Heriberto if he was a gangbanger and if he was a Sureño.  Heriberto said, "No."  Others told him that he looked like a Sureño and yelled, "Scrapa."  They surrounded Heriberto, asked him if he had tattoos, and lifted up his shirt.  Heriberto said, "Don't touch me," and moved back.  At that point, Juan told the men that they had come just to play and that they did not want any problems.  They ignored Juan and began to push and hit Heriberto.

As Heriberto continued to retreat, more individuals arrived to harass him.  Juan looked back at Heriberto and saw one of the men hit him.  Juan was unable to get close to Heriberto because there were so many men involved in the attack.  Some of the men began attacking Juan.  Juan responded by throwing a half-full beer can at the group attacking Heriberto.[5]  One of the men was hit in the face.  Defendant participated in the fight.

---

[5] Juan began drinking beer between 1:30 and 2:00 p.m. and consumed five or six beers before his arrival at Roosevelt Park at 5:30 or 6:00 p.m.  When he arrived at

Heriberto fell to the ground after one of the assailants hit the back of his head. Salas and Lynch proceeded to stomp on Heriberto's head. Becerra and Chavarria stomped on Heriberto's body. Defendant, Lamas, Hernandez, Conklin, and Chavarria hit Juan, and he was eventually knocked out.

Cervantes heard Larios calling for him and Reyes and saying, "Juanito is on the ground." As Cervantes and Reyes went to the basketball courts, several people were running to the parking lot. Both Juan and Heriberto were lying on the ground. Noriega and Cervantes went to Juan while Reyes went to Heriberto. Juan was unconscious, but he woke up when Noriega spoke to him. Heriberto was unconscious and bleeding from the side of his head, mouth, ears, and nose.

Cervantes called 911. When the police did not arrive after about five or 10 minutes, Cervantes and Reyes took Heriberto to the hospital. Heriberto sustained multiple blunt force injuries to his arms and legs, but the majority of the blunt force injuries were to his head. Heriberto died due to "brain stint herniation," which occurred when "the bottom of his brain was forced into the bottom of his skull."

Juan was also taken to the hospital, where he was treated. He had bumps all over, including on his forehead.

### D.    Gang Evidence

Clayton Le, an investigator for the Santa Clara County District Attorney's Office, testified as an expert in the area of Hispanic street gangs. He opined that the RPL gang represents a subset of the Norteño criminal street gang. He noted that RPL members wear the color red and use the number "14" and the letter "N," which signifies Norteño. They pay homage to other Norteño gangs, including the Nuestra Familia prison gang. RPL members also display the Huelga bird as a symbol and have painted the Huelga bird on a handball court in Roosevelt Park.

the park, Juan grabbed a can of beer prior to heading to the basketball court. Juan testified that he did not feel any effects from the beer.

6

One of the primary concerns for the RPL is to maintain respect, that is, to keep control of their territory. Thus, they confront or "check" individuals they believe are members of a rival gang. The RPL claim Roosevelt Park and adjoining streets as their territory. The primary activities of the RPL are murder, attempted murder, and assault with force likely to produce great bodily injury. Sureño gang members are the primary rivals of the RPL.

Le opined that defendant was a member of the RPL based on his tattoos and testimony that he had been voted into the gang in March 2012. Given the timing and pattern of the offenses, Le believed that defendant was "putting in work" for the gang, that is, committing offenses on behalf of the gang to increase his status and show his commitment. Le also opined that Lynch was a member of the RPL and Salas was attempting to gain membership in the RPL.

When given hypotheticals mirroring the facts of the assault on Jimenez, the attempted murder of Romero, and the assault in Roosevelt Park, Le opined that these crimes were committed for the benefit of, and in association with, a criminal street gang.

## III. THE DEFENSE CASE

Defendant presented the testimony of Deputy Sheriff Adam Stockeland who interviewed Romero as he was being treated by paramedics at the scene and later at the hospital. He confirmed various inconsistencies between Romero's testimony and his initial statements to law enforcement. Defendant also presented the testimony of James Norris, a forensic science consultant, on the effects of marijuana on the body and cognition. In addition, defendant called Sergeant Stewart Davies to testify regarding an interview with Gustavo.

Codefendant Salas presented the testimony of Dr. Jesse De La Cruz, an expert on criminal street gangs, and Dr. Ricardo Weinstein, a forensic neuropsychologist.

7

## IV.  DISCUSSION

### A.  *Instructions on Murder and Attempted Murder*

Defendant concedes that the trial court's use of pattern instructions for murder (CALCRIM No. 520) and for attempted murder (CALCRIM No. 600) properly stated the elements for these crimes.  However, he contends that the instructions were inconsistent and likely confused the jury on the necessary mental state for attempted murder.  He asserts that the instructions improperly allowed the jury to find him guilty of the attempted murder on an implied malice theory.

The Attorney General contends that defendant forfeited this claim by failing to request clarifying instructions.  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901.)  Assuming that the claim has not been forfeited, we conclude that it has no merit.

" 'The mental state required for attempted murder has long differed from that required for murder itself.  Murder does not require the intent to kill.  Implied malice—a conscious disregard for life—suffices.  [Citation.]' [Citation.]  In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).)  Thus, "implied malice instructions should never be given in relation to an attempted murder charge.  [Citations.]" (*People v. Lee* (1987) 43 Cal.3d 666, 670 (*Lee*).)

Our review of a claim of instructional error is de novo.  (*People v. Rivera* (2019) 7 Cal.5th 306, 329.)  We must consider the instructions as a whole to determine whether there is a reasonable likelihood that the jury improperly applied the instruction.  (*Ibid.*)

Here, defendant was charged in count 1 with the murder of Heriberto.  The prosecution's theory was that he was guilty on an aiding and abetting theory.  The trial court instructed the jury pursuant to CALCRIM No. 520:  "Scott Conway.  The defendant is charged in Count 1 with murder in violation of . . . section 187."  The jury

8

was further instructed that in order to return a conviction for murder, it was required to find that defendant "had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought. Express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if, one, he intentionally committed an act. Two, the natural and probable consequences of the act were dangerous to human life. Three, at the time he acted he knew his act was dangerous to human life. And four, he acted with conscious disregard for . . . human life."

Defendant was charged with attempted murder based on the stabbing of Romero. The trial court instructed the jury pursuant to CALCRIM No. 600. The instruction provided in relevant part: "Attempted murder, Count 4, applies to Scott Conway only. The defendant is charged in Count 4 with attempted murder. To prove that the defendant is guilty of attempted murder, the People must prove that, one, the defendant took at least one direct but ineffective step toward killing another person, and, two, the defendant intended to kill that person. A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. [¶] A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt."

CALCRIM No. 600 correctly sets forth the elements of attempted murder. (*People v. Ramos* (2011) 193 Cal.App.4th 43, 47.) The instruction unambiguously requires the jury to find that defendant intended to kill the victim. There is nothing in the instruction that suggests the jury could find defendant guilty of attempted murder

9

with implied malice.  Moreover, the instruction on attempted murder explicitly referred to count 4 while the murder instruction referred to count 1.  The jury was also instructed that "each of the counts charged in this case is a separate crime," and it was required to "consider each count separately."  We must assume that the jury followed the trial court's instructions.  (*People v. Ramirez* (1997) 55 Cal.App.4th 47, 58 (*Ramirez*).)  Accordingly, we conclude that the jury was not reasonably likely to apply the definition of implied malice in the murder instruction to the mental state required for a conviction for attempted murder.

The cases upon which defendant relies are distinguishable from the present case.  In *Lee*, the trial court correctly instructed the jury that "attempted murder requires the specific intent to unlawfully kill," but it also gave a modified instruction: " '*Malice may be implied* when the attempt [*sic*] killing results from an intentional act . . . which act is done . . . with a wanton disregard for human life.  When it is shown that an attempt [*sic*] killing resulted from the intentional doing of an act with implied malice, no other mental state need be shown to establish the mental state of malice aforethought . . . .'  (CALJIC No. 8.11, as modified, italics added.)" (*Lee*, *supra*, 43 Cal.3d at p. 670.)  The jury was also instructed that " '[w]hen the attempt [*sic*] killing is the direct result of such an intentional act, *it is not necessary to establish that the defendant intended that his act would result in the death of a human being.*' (CALJIC No. 8.31, as modified, italics added.)" (*Ibid*.)  Thus, the instructions in *Lee* erroneously stated that attempted murder could be found under a theory of implied malice.  No such instructions were given in this case.

In *People v. Beck* (2005) 126 Cal.App.4th 518 (*Beck*), the trial court instructed the jury with CALJIC No. 8.66, which provided in relevant part: " 'Every person who attempts to murder another human being is guilty of a violation of . . . sections 664 and 187.  [¶]  Murder is the unlawful killing of a human being with malice aforethought. [¶]  In order to prove attempted murder, each of the following elements must be

10

proved; [¶] . . . ; and [¶] 2. The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being.' " (*Beck*, at p. 522.) Though the defendant was not charged with murder, the trial court also instructed the jury with CALJIC No. 8.11. (*Beck*, at pp. 521, 522.) This instruction provided in relevant part: " 'When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.' " (*Id.* at p. 522.) The parties agreed that the trial court erred when it reintroduced the implied malice theory. (*Id.* at p. 524.) Unlike in *Beck*, here, the attempted murder instruction did not refer to malice aforethought, and the instructions on implied malice were limited to the murder instruction.

### B.    *Prosecutorial Misconduct*

Defendant also contends that the prosecutor committed misconduct when he misstated the law on the mental state required for attempted murder during argument.

" ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" [Citations.]' [Citation.]" (*People v. Powell* (2018) 6 Cal.5th 136, 172.) "[I]t is improper [for the prosecutor] to misstate the law [citation] . . . ." (*People v. Bell* (1989) 49 Cal.3d 502, 538.) "A prosecutor's misstatements of law are generally curable by an admonition from the court." (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).)

### 1. Background

In discussing the attempted murder charge against defendant, the prosecutor stated: "This is why it's attempted murder. You heard Dr. Beninghoven testify. Walter Romero suffered two collapsed lungs. Tubes were inserted into his chest and if Walter doesn't get to the hospital, he will die. Walter Romero is lucky to be close to home. He's lucky his brother is home. Walter is lucky he found someone to help him or he would have died. [¶] And ladies and gentlemen, take your life experiences with you in the deliberation room. *When someone gets stabbed three times along the side, that's an intent to kill, or implied malice, a wanton disregard for what you did.* You can't stab someone— [¶] [DEFENSE COUNSEL]: Objection. [¶] THE COURT: Legal basis? [¶] [DEFENSE COUNSEL]: There must be— [¶] THE COURT: Come on up." (Italics added.)

After a discussion was held off the record, the trial court admonished the jury: "All right. Ladies and gentlemen, again I remind you the comments of counsel are not evidence. If there is a conflict between what counsel says and what the jury instructions say, the jury instructions are to be followed by you."
The prosecutor then again misstated the law as to attempted murder: "You are going to get a jury instruction about murder. And you've heard the term malice aforethought. There's two types of malice. Direct malice and implied malice. Implied malice says you can't stomp somebody on the head and then say I wasn't intending to kill him. The very act of stomping somebody on the head is implied malice. *The very act of stabbing someone three times on the side of his body is implied malice.* This is the same as murder, the attempted murder, only there's an element that says you take a step but it was ineffective at killing somebody. *That's what attempted murder is. You failed. But it's implied malice. My argument is that* [d]*efendant Conway exercised implied malice when that stabbing took place on Walter Romero.*" (Italics added.)

### 2. Analysis

Here, as previously discussed, implied malice is not an element of attempted murder. (*Smith*, *supra*, 37 Cal.4th at p. 739.) Thus, the prosecutor improperly misstated the law in closing argument. However, the trial court admonished the jury that it must follow the court's instructions on the law rather than any conflicting comments made by counsel. The jury was also correctly instructed on the elements of attempted murder. Since we presume the jury followed the trial court's admonishment and the instructions on attempted murder, and there is nothing in the record to indicate that it did not do so, we find the prosecutor's comments were not prejudicial. (*Ramirez*, *supra*, 55 Cal.App.4th at p. 58; *Centeno*, *supra*, 60 Cal.4th at p. 674.) Defendant's reliance on *People v. Najera* (2006) 138 Cal.App.4th 212 does not support his position. In that case, the prosecutor misstated the law regarding heat of passion. (*Id.* at p. 223.) The *Najera* court concluded: "The trial court correctly instructed the jury to follow the court's instructions, not the attorneys' description of the law, to the extent there was a conflict. We presume the jury followed that instruction. [Citation.]" (*Id.* at p. 224.) Similarly, here, the trial court correctly admonished the jury.

### C. Removal of Juror

Defendant argues that the trial court erred when it removed Juror No. 5 during deliberations without good cause.

### 1. Background

After deliberating for approximately three days, Juror No. 12, who was the jury foreperson, sent a note to the trial court: "We have come to the point where there is a juror that can't set aside bias. This juror has talk[ed] openly of looking up the details of the lawyers and brought in info from outside the trial. What do we do? We are getting stuck."

In response to the note, the trial court questioned Juror No. 12. The following exchange occurred: "THE COURT: We are in receipt of your juror note. All attorneys have been provided with that note. Would you please let me know what prompted the writing of that note. [¶] JUROR 12: So as we were starting I received some information from one of my fellow jurors [Juror No. 5], that they had looked up counsel. This was before I was voted as the foreman of the jury. [¶] . . . [¶] THE COURT: Okay. And when Juror No. 5 let you know that, did you respond in any way? [¶] JUROR 12: Yes, I did. [¶] THE COURT: And what did you say? [¶] JUROR 12: I said that she shouldn't have looked anything up. That she needs to set this aside, that we need to continue with the information we received in court only. [¶] . . . [¶] THE COURT: All right. So then what happened? [¶] JUROR 12: So we started deliberating. And as we deliberated through these past days small pieces of information would come out that I knew weren't part of the case that we heard in court. It was extra information and . . . to the credit of other jurors, they would say that wasn't part of the case. [¶] THE COURT: Could you give me examples, please. I don't want to know what the other jurors specifically said. [¶] JUROR 12: Yes. She said that the City was working on a large gang crackdown currently. I can't remember what the phrase was that she had—she [had] a title for it or something, but I can't recall what the title was. [¶] THE COURT: Okay. Anything else? [¶] JUROR 12: Most—so what drove me to write the letter was the most recent where . . . she kept talking about a . . . Penal Code that we didn't have in our instructions. And I kept asking her, where is this in the instructions that we've received? Where is it? And the argument was evolving to, I know it was read to us. And contention began to spring in the jury. And I didn't want . . . name calling. I stopped it there. And then we were silent for a while. [¶] . . . [¶] JUROR 12: Yes. And then . . . to the last point that I made where she . . . wouldn't move past her biases. And specifically she has said that we were putting people away for life, or something like that, and that we needed to

14

take our time. And that's just one of the very first instances. I don't want to go into the rest of them because they would be too revealing. [¶] THE COURT: Well, okay. So . . . [¶] JUROR 12: Okay. So ultimately she was demanding that we consider the consequences of our deliberations as a weight within our deliberations. And I read to her many times that we were not supposed to consider the punishment. And she would not heed my instruction, nor waver from the bias of that opinion. [¶] THE COURT: And how do you know that she would not heed to the instruction not to consider punishment or penalty? [¶] JUROR 12: She said so repeatedly. [¶] THE COURT: And what words did she use? [¶] JUROR 12: She said, 'I can't do that.' [¶] THE COURT: Did she provide any details about any information she might have ascertained from the looking up of counsel? [¶] JUROR 12: No, she didn't. [¶] THE COURT: Do you have a context or some specific reference to the Penal Code Section that was being referenced that was not part of the jury instruction packet? I don't need a number, but do you have a— [¶] JUROR 12: She was saying that we had to prove a financial benefit. [¶] THE COURT: All right. And . . . was there pushback? [¶] JUROR 12: Against the— [¶] THE COURT: Against the notion that that was not part of what you were instructed on. [¶] JUROR 12: . . . I, as I've done many times this case, said, let's read our instructions. As we were going through our instructions we were like pointing out that this is an 'and,' or this is an 'and/or,' or this is an 'or' statement at different points saying that none of these things pointed to anything that she was talking about. [¶] THE COURT: And was there a response from Juror No. 5? [¶] JUROR 12: Other than a strong insistence that we were missing information. [¶] THE COURT: Okay. Meaning that there was information outside of trial? [¶] JUROR 12: That you either had failed to give us a particular piece of information, or that within this packet that we had heard in court and that we ought to know now, which— [¶] THE COURT: Is there any other information that you want to give to the Court? [¶] JUROR 12: That's it."

15

The trial court next called in Juror No. 5 for questioning. Juror No. 5 admitted that she had looked up information about the trial judge and that she had read a newspaper article about the present case in 2012 that mentioned the prosecutor. She also looked up information about defendant's counsel. Juror No. 5 was interested in "his qualifications as an attorney" and "wanted to know the credibility of the attorney[]." She explained that she had overheard him say that he had been "an attorney for Family Court or abused situations," and she was interested "because it kind of goes along with my child advocacy." She wanted to know his background. She knew he was a criminal attorney, but she "wondered how long he's been in the defense of gang representation versus being representing battered, abused situations." She learned "just his name and that he was registered as that, and that's it." After Juror No. 10 mentioned that she had looked up the criminal street gang statute, Juror No. 5 told her that she had looked up an attorney.

Juror No. 5 also disclosed that she had personal information concerning a gang crackdown in San Jose, which she had mentioned to another juror. When the trial court asked whether she had made any statements during deliberations that indicated that she was considering penalty or punishment, Juror No. 5 responded that they were having "heated debates" and she was "giving all angles to the conversation," and she was "rubbing some people pretty wrong." She denied making any statements that the charges might carry a life sentence. However, she did say that she was "taking everything into consideration." She explained that she made the statement "in the context of the seriousness of the importance of the information I was trying to get across." She conceded that the other jurors had asked her not to consider penalty or punishment. Juror No. 5 also told other jurors that she believed the instructions defining a criminal street gang provided by the trial court were incomplete. She explained to the trial court that she wanted to know the other 30 crimes in the definition, so she "could formulate if this is indeed a criminal street gang or not." She

16

denied doing any independent research on that topic but stated that Juror No. 10 had done so. Based on her prior experience and knowledge of gangs, she thought that the definition of a criminal street gang included an element of financial gain.

After a break, the trial court asked Juror No. 5 if she could set aside the information that she had learned about defendant's counsel. She responded, "Of course." She also stated that she could set aside what she knew about the city's crackdown on gangs. However, she expressed some reluctance to accept that the jury had been given the "full" definition of a criminal street gang. The following exchange occurred: "THE COURT: So the question is, are you able to rely only on what is in your packet? [¶] JUROR 5: Yes. [¶] THE COURT: Truly? [¶] JUROR 5: Truly. [¶] THE COURT: Your body language is saying something very different to me. [¶] JUROR 5: No. Truly." Juror No. 5 also stated that she was able to set aside her position on financial benefit and whether she needed to know the 30 crimes that she believed were part of the definition of a criminal street gang.

The trial court then called in Juror No. 10, who stated that she had looked up section 186.22. She explained that she was curious when the statute was referred to in court, and she wanted to know "what that number meant." She conducted an Internet search and saw that the statute related to criminal gangs, but she did not read further. She did not read the definition included in the statute. Juror No. 10 denied researching anything else about the case.

When Juror No. 10 was asked whether she had received information from any other juror that he or she had researched anything in the case, she stated that Juror No. 5 had conducted research on the defense expert on brain development, the defense expert on gangs, and the attorneys. Juror No. 10 also stated that Juror No. 5 disclosed "very little" about her research. Juror No. 10 stated that she could set aside the information she discovered during the search.

17

Following the questioning of the jurors, the prosecutor asked that Juror No. 5 be removed from the jury. He argued that Juror No. 5 had admitted misconduct, but she had not been truthful about the extent of her research as revealed by Juror No. 10. He also noted that her body language indicated that she would not be able to set aside the improperly obtained information.

Counsel for all three defendants opposed the removal of Juror No. 5. Counsel for Salas argued that Juror No. 5 acknowledged that what she did was wrong and that she could set the information aside. He also noted that she was very clear that she would follow the trial court's instructions and set aside her biases. Counsel for Lynch pointed out that any concern about potential punishment was a result of evidence admitted during the trial regarding the exposure of the codefendants who had pleaded guilty and then testified for the prosecution. He also noted that there had been evidence about marijuana sales by gang members which explained Juror No. 5's position on the financial benefit issue. Defendant's counsel argued that there was insufficient justification for her removal. He did not "find her body language to be withholding."

Following argument, the trial court decided to remove Juror No. 5 for misconduct. "THE COURT: All right. The Court looked at the issues related to Juror No. 5 cumulatively. Some were given weight and some were not. The Court agrees with [Lynch's counsel] to a certain degree that some of the issues raised, in and of themselves, could be based on what was heard in the courtroom. [¶] The penalty or punishment is more of an interesting issue. In and of itself, I don't think it warrants dismissal of a juror. However, the Court's true concern here is the research, for lack of a better term, done by this juror with respect to the participants in this trial. [¶] And I don't have any way of ascertaining what exactly was found. I tried through my questioning, particularly as to information that was ascertained as to [defendant's counsel]. I don't know what was ascertained as to Dr. De La Cruz or Dr. Weinstein.

18

But the fact that Juror No. 5 indicated that she took it upon herself to look up folks at all involved in this trial, with the exception of the Court, because I think the Court is a public—I'll call it a public figure, and that's okay, for lack of a better term. [¶] But I am concerned that the focus during the conversation with this juror was not on the defendants or the people, which is where the conversation is supposed to be in that jury room, rather than on the attorneys. I have no idea what was ascertained. I don't know if it was positive or negative. I don't know if the impression is positive or negative, and that really worked to the disadvantage of [defendant] or to extraordinary advantage of [defendant] and to the disadvantage of the People. [¶] Either way the Court cannot be assured that this juror can be fair and impartial. We all have disagreements about body language and the manner in which the courses were stated. The Court would not resolve favorably credibility issues with respect to Juror No. 5, in favor of Juror No. 5. [¶] So for that reason I am going to remove Juror No. 5 for misconduct. And specifically it's a cumulative issue. But mostly because I believe [defendant's counsel], unfortunately, has become a source of discussion where you really in fairness should not be. And you didn't do anything wrong. So that's where that is."

Counsel for defendants also requested that Juror No. 10 be removed. After calling Juror No. 10 in for further questioning, the trial court decided not to remove Juror No. 10. The trial court noted that though Juror No. 10 looked up a code section, she did not "glean any information that's inconsistent." The trial court also found Juror No. 10 was credible and "her body language was consistent with what she was saying."

Counsel for defendants subsequently filed a motion to reinstate Juror No. 5. Alternatively, they brought a motion for a mistrial based on the removal of Juror No. 5. The trial court declined to reinstate Juror No. 5 and denied the mistrial motion. The trial court stated: "But first is the concern that any juror who does research about

19

anyone related to the trial is violating a Court order. But as you know, that is not dispositive in and of itself. [¶] There are violations of a court order and then there are violations of court orders. So that – for the Court here – is not the dispositive issue. [¶] The truly dispositive issue is the fact that the research was done regarding the attorneys. Juror No. 5 was unable to or unwilling to – and this is where the body language issue comes into play – articulate for the Court exactly what research she did regarding the attorneys. [¶] The Court noted from the body language that she was quite hesitant. She looked away. And was dismissive, quite frankly, when the Court went through the various admonitions about whether or not she could be fair. The fact that she could not articulate what she looked at – and [defendant's counsel] did seem to be the focus. [¶] . . . [¶] . . . [¶] THE COURT: That she could not articulate exactly what she looked up or that she heard [defendant's counsel] say something about representing children or something to do with children or something to do with domestic violence, and she wanted to sort of reconcile that, for lack of a better term— and that's a subjective term—but to somehow see how he represented gang people in connection with domestic violence. [¶] So I'm not quite sure—and I couldn't make the connection because the juror could not articulate. [¶] The Court has no confidence that Juror No. 5 is able to be fair and impartial here, because she could not really articulate for the Court what happened. [¶] I contrast that with Juror No. 10 who was quite clear on what she looked up, what she saw, what she read. And was quite clear with the Court when the Court voir dired her. [¶] I can say this unequivocally. I don't know what information was gleaned. Juror No. 5 was unable to articulate that for the Court, which leads to the credibility issue. And the Court strongly disagrees with [Salas's counsel], the Court is required to reconcile credibility issues on this type of situation. And I would not reconcile credibility issues in favor of this particular juror."

20

## 2. *Analysis*

The trial court may discharge a juror at any time, upon "good cause shown to the court," if the juror "is found to be unable to perform his or her duty." (§ 1089; see *People v. Lomax* (2010) 49 Cal.4th 530, 588 (*Lomax*).) Juror misconduct can constitute good cause to discharge a juror. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69-70.) It is misconduct for a juror to conduct an independent investigation or bring outside evidence into the jury room. (*People v. Wilson* (2008) 44 Cal.4th 758, 829-830 (*Wilson*).) It is also misconduct for a juror to consider legal concepts that were not included in the instructions (*In re Stankewitz* (1985) 40 Cal.3d 391, 397 (*Stankewitz*)) and to consider potential punishment (*People v. Hord* (1993) 15 Cal.App.4th 711, 725 (*Hord*)).

" 'In determining whether juror misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1194.) The ultimate decision to discharge a juror is a matter within the trial court's discretion. (*Lomax*, *supra*, 49 Cal.4th at p. 589.) However, " 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal. [Citation.]" (*Ibid.*) "[T]he basis for a juror's disqualification must appear on the record as a 'demonstrable reality.' This standard involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence in the record supports the trial court's decision. [Citation.] It must appear 'that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.' [Citation.] However, in applying the demonstrable reality test, we do not reweigh the evidence. [Citation.] The inquiry is whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]" (*Id.* at pp. 589-590, fn. omitted.)

21

Defendant contends that the record fails to show a demonstrable reality that Juror No. 5 was unable to perform her duty. We disagree.

Here, Juror No. 5 conducted independent research and introduced other evidence into the jury room. She disclosed that she had looked up information about the prosecutor and defendant's counsel to other members of the jury. Though Juror No. 10 stated that Juror No. 5 conducted research on two of the defense expert witnesses, Juror No. 5 did not mention this research. Juror No. 5 also mentioned information about a current city-wide crackdown on gangs to other jurors.

Defendant concedes that Juror No. 5's outside investigation was a "technical violation" of the trial court's instruction. He argues, however, that any prejudice from this misconduct was rebutted by her explanation of the events and her assertion that she could be fair and impartial. He also notes that her research did not disclose any bias. Defendant has overlooked that the trial court found that Juror No. 5 was not credible in asserting that she could be fair and impartial.

Juror No. 5 also tried to include legal standards that were not included in the jury instructions during deliberations. She told jurors that there needed to be proof of a financial benefit to the gang and insisted they "were missing information." In addition to the three pattern offenses mentioned in the instructions, she wanted proof of the other 30 pattern offenses. Though the trial court stated that the instructions on the definition of a criminal street gang were complete, Juror No. 5 questioned this statement. When Juror No. 5 stated that she could set aside her belief that there was additional law as to the definition of a criminal street gang and rely on the jury instructions, the trial court observed that Juror No. 5's "body language [was] saying something very different."

Defendant contends that Juror No. 5's "understanding of a possible financial component was based on the testimony of one of the defense experts," and she assured the trial court that she could abide by the jury instructions. First, Juror No. 5 stated

that her understanding of the definition was based on "a little training in what a gang is . . . working with the DA's and different people that speak to child advocates to get a full gamut of the kids that are in the system" in addition to De La Cruz's testimony. Thus, Juror No 5 was relying on information other than the jury instructions. Second, the trial court found Juror No. 5 not credible.

According to Juror No. 12, Juror No. 5 "was demanding that we consider the consequences of our deliberations as a weight within our deliberations. And [she] read to her many times that we were not supposed to consider the punishment." In response, she said, " 'I can't do that.' " Juror No. 5 acknowledged that other jurors asked her not to consider penalty or punishment.

Defendant asserts that the Attorney General's summation of the record is misleading. He claims that "Juror No. 5's responses indicate she did not discuss whether the charges might carry a life sentence but simply observed that who was involved in the incidents underlying the various counts was pertinent to the discussion of culpability." This is not a reasonable interpretation of Juror No. 5's responses to the trial court's questions.

The following exchange occurred between the trial court and Juror No. 5: "THE COURT: . . . do you believe that you've made any statements about the fact that penalty or punishment should be considered? [¶] JUROR 5: No. Penalty or—you can you expand? [¶] THE COURT: Have you made any statements that the charges might carry a life sentence? [¶] JUROR 5: No. I am taking everything into consideration. And to put that in a contextual mode, if I may? . . . [¶] JUROR 5: Okay. How can I word this? We were weighing who was involved in a certain situation. And a few people kind of said, well, it doesn't matter. And to me, I said, it does matter. . . . [¶] JUROR 5: I'm saying that I did say that, but I said it in the context of the seriousness of the importance of the information I was trying to get across." Juror No. 5 also acknowledged that other jurors asked her not to consider

23

penalty or punishment. When the trial court asked how she felt about that, she responded, "I absolutely do. I was in the heat of emotional. We'd had quite a debate on evidence, and I was the one that took the most notes."

When questioned by the trial court, Juror No. 5 wanted an explanation of "penalty or punishment." She first denied stating that the charges might carry a life sentence, but immediately then stated that she "was taking everything into consideration," which might include penalty or punishment. She also asserted that she "did say that . . . in the context of the seriousness" of her arguments on an issue. Her acknowledgement that jurors asked her not to consider penalty or punishment established that she had done so.

In sum, Juror No. 5 committed misconduct in conducting outside research (*Wilson*, *supra*, 44 Cal.4th at pp. 829-830), urging jurors to consider legal concepts not included in the instructions (*Stankewitz*, *supra*, 40 Cal.3d at p. 397), and considering punishment (*Hord*, *supra*, 15 Cal.App.4th at p. 725). The trial court specifically found Juror No. 5 was not credible in stating that she could remain fair and impartial. Thus, the trial court did not abuse its discretion in removing Juror No. 5 because the record showed a demonstrable reality that she was unable to perform her duty.

### D. CALCRIM No. 315

Defendant contends that the trial court committed reversible error when it instructed the jury pursuant to CALCRIM No. 315: "In evaluating identification testimony, consider the following questions: . . . How certain was the witness when he or she made an identification?" Defendant argues that there is a "growing body of evidence demonstrating no correlation between reliability and the confidence of a witness's identification."

#### 1. Forfeiture

The Attorney General contends that defendant forfeited any challenge to CALCRIM No. 315 by failing to request modification in the trial court. But the

24

California Supreme Court had repeatedly approved the inclusion of the certainty factor in CALJIC No. 2.92, the predecessor to CALCRIM No. 315, at the time of trial. (*People v. Sanchez* (2016) 63 Cal.4th 411, 461-463; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232; *People v. Wright* (1988) 45 Cal.3d 1126, 1144.) Based on this precedent, any objection to the certainty factor or request for a modification of CALCRIM No. 315 would have been futile. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections"].) Thus, this issue has not been forfeited.[6]

### 2. *Eyewitness Identification Testimony Presented at Trial*

Jimenez testified that he was assaulted by two men on the evening of March 10, 2012. One man was tall, thin, and white-skinned, and the other man was "regular height," muscular, and dark-skinned. He had never seen either of the men before. Jimenez testified that he had been shown a photo lineup in July 2012. He had identified a photo of defendant in the photo lineup as the white man who had assaulted him and told the police: " 'Yes, it's him.' . . . 'I remember his eyes. I'm very sure.' " At the June 2016 trial, he made a courtroom identification of defendant as the white man who had assaulted him. During a very brief cross-examination, defendant's trial counsel asked Jimenez: "If you'd never seen him before and it was dark when you saw him, how could you see his eyes well enough?" Jimenez responded: "Because they were both near me. They got up really close to me and they surrounded me."

Romero testified that he was stabbed in April 2012. Four males and one female approached him. Two of the males were African-American, one was white, and one was "Mexican." The white man was tall and had a medium build. In May 2012, Romero picked out a photo of defendant in a photo lineup as the white man who had

---

[6] Based on this conclusion, we need not address defendant's alternative argument that his trial counsel rendered ineffective assistance when he failed to object to the certainty factor in CALCRIM No. 315.

assaulted him and told the police "I think he was the one." When Romero was asked if the white man who had assaulted him was in the courtroom, he responded "I'm pretty sure he is" and pointed to defendant. Romero testified that he had also encountered defendant three or four months prior to the April 2012 stabbing. Romero had been coming home from school with a friend when defendant and others approached them. Defendant asked Romero if he "banged," and punched him in the face.

The prosecutor argued to the jury that Jimenez "points out number one which was [d]efendant Conway and says, yes, it's him. I remember his eyes. I am very sure. [¶] This—you have this in evidence." The prosecutor argued to the jury that Romero "knows [d]efendant Conway" and therefore was able to identify him. He asserted that Romero had identified Conway "four times over the last five years."

### 3. *Analysis*

In his original briefs, defendant contended that the witness certainty factor in CALCRIM No. 315 violated his due process rights by reducing the prosecution's burden of proof because it instructed the jury to consider "an irrelevant factor," and by interfering with his ability to present a defense.

These claims were recently addressed by the California Supreme Court in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). The California Supreme Court held that the witness certainty factor in CALCRIM No. 315, "in the context of the trial record as a whole, . . . did not render [the defendant's] trial fundamentally unfair." (*Lemcke*, at p. 646.) It noted that the instruction did not tell the jury that " 'certainty equals accuracy,' " that the defendant had been permitted to call an eyewitness identification expert, and that the trial court had instructed the jury that it was required to consider that expert's testimony. (*Id.* at p. 647.)

In *Lemcke*, the victim had identified the defendant in a photo lineup shortly after the crime, but she was " 'under anesthesia' " at the time of the identification. (*Lemcke*, *supra*, 11 Cal.5th at p. 648.) During subsequent identification procedures,

26

the victim told the police " 'for sure it was [the defendant].' " (*Id.* at p. 649.)  The victim also made an in-court identification of the defendant at trial.  (*Id.* at pp. 649-650.)  She testified that "it was 'impossible for [her] not to recognize his face.' " (*Id.* at p. 650.)  The defense expert testified that witness certainty was relevant only when the identification occurred shortly after the event.  (*Id.* at p. 651.)

On appeal, the defendant argued that the trial court's inclusion of the witness certainty factor in CALCRIM No. 315 violated his state and federal due process rights.  (*Lemcke*, *supra*, 11 Cal.5th at p. 653.)  The California Supreme Court rejected his claim.  It held that, when viewed in context with the other standard jury instructions, the witness certainty factor did not " 'lower the prosecution's burden of proof' " or interfere with the jury's evaluation of the credibility and reliability of the eyewitness's identification testimony.  (*Id.* at pp. 657-659.)  Nor did the instruction obstruct the defendant's right to present a defense, as he did by cross-examining the victim and presenting his eyewitness identification expert.  (*Id.* at p. 660.)

After the California Supreme Court's decision in *Lemcke*, defendant submitted supplemental briefing attempting to distinguish this case from *Lemcke*.  First, he claims that *Lemcke*'s rejection of the due process arguments does not apply here because he did not present an eyewitness identification expert.  Second, he claims that the California Supreme Court concluded in *Lemcke* that it was "erroneous as a matter of state law" to instruct on the witness certainty factor.  Finally, he argues that he was prejudiced by the inclusion of the witness certainty factor because it "very likely confused the jurors by strongly suggesting that an eyewitness's certainty is directly correlated to the accuracy of that witness's identification of the defendant."

We do not find *Lemcke* substantially distinguishable.  While the defense did not present an eyewitness identification expert in this case, the defense had a full and fair opportunity to test the reliability and accuracy of the eyewitness identification testimony through cross-examination, an opportunity that it utilized.  The witness

27

certainty factor in CALCRIM No. 315 did not obstruct the defense's ability to challenge the eyewitness identification testimony, and the trial court's standard instructions ensured that the jury was fully apprised of the prosecution's burden of proof. We therefore conclude that, as in *Lemcke*, the inclusion of the witness certainty factor in CALCRIM No. 315 did not violate defendant's right to due process.

His remaining contention that the inclusion of this factor was a prejudicial state law error lacks merit. The record contains no indication that the witness certainty factor played any role in the jury's evaluation of the accuracy of the identification testimony given by Romero and Jimenez.

Jimenez, who had never seen defendant before the crime, identified defendant in a photo lineup a few months after the crime and again at trial. While the witness certainty factor was potentially relevant to Jimenez's testimony (because he testified that he was "sure"), Jimenez explained that his certainty was due to his proximity to defendant during the crime. This was not a situation where the witness's expressed certainty was disconnected from the other factors that CALCRIM No. 315 properly identifies as relevant to the reliability of eyewitness identification testimony, such as how well the witness could see the perpetrator and whether the witness had identified the perpetrator in a photo lineup. Romero testified that he was "pretty sure" that defendant was his assailant, and he explained that he recognized defendant because he had been attacked by defendant a few months prior to the crime. Romero, like Jimenez, had identified defendant in a photo lineup, and he had done so just a month after the crime.

On this record, the unchallenged factors in CALCRIM No. 315 strongly supported the accuracy of the identification testimony given by Romero and Jimenez. Accordingly, we conclude that it is not reasonably probable that the defense would have achieved a more favorable result in the absence of the witness certainty factor's inclusion in CALCRIM No. 315. (*People v. Watson* (1956) 46 Cal.2d 818, 837.)

28

### E. Motion for Mistrial

Defendant argues that the trial court erred when it denied his motion for mistrial after the prosecutor failed to ensure that a witness did not disclose information about his juvenile history.

#### 1. Background

Defense counsel brought a motion in limine to preclude the admission of any evidence of defendant's prior criminal convictions. At the hearing on the motion, the prosecutor stated that he did not intend to introduce any evidence of defendant's prior convictions or uncharged conduct. Thus, the trial court granted the defense motion.

The following exchange occurred during trial between the prosecutor and Detective Nicholas Bronte. "Q. (By [the prosecutor]): Now, based on your knowledge of the crime, where it occurred, and that you knew that Scott Conway may have been affiliated with the Roosevelt Park Locos, did you form – and based on the suspect descriptions that you were given about this particular crime, did you develop a photo lineup with Scott Conway in it? [¶] A. Yes, I did. [¶] Q. What photo was he in the lineup? [¶] A. Number 1. [¶] Q. Detective Bronte, I am showing you what's been marked People's Exhibit 11 for identification purposes. It is a photo lineup. Can you go through it and tell me if you're familiar with that? [¶] A. Yes. This is the lineup I created of Scott Conway. [¶]: Q. And you mentioned that you put Scott Conway in that lineup? [¶] A. Yes. [¶] Q. And what photo did you put him under? [¶] A. Number one. [¶] Q. Can you go to number one in the photo lineup. And that picture—what does that picture depict in People's Exhibit 11-B? [¶] A. It's a mugshot of Scott Conway taken by Juvenile Probation."

Defense counsel immediately objected and moved to strike the testimony. Following a discussion which was held off the record, the trial court stated: "All right. The motion to strike the portion of the answer 'taken by Juvenile Probation' is granted by agreement of both [the prosecutor] and [defense counsel]. [¶] Ladies and

gentlemen, you are not to consider the stricken portion of the answer for any purpose. You are not to consider that Juvenile Probation may or may not have been involved in the situation. You are not to speculate about Juvenile Probation at all. So it is stricken. You are not to consider it for any purpose."

The next morning, defense counsel made a motion for a mistrial on the ground that Detective Bronte had disclosed that defendant had a juvenile history. Defense counsel noted that the trial court had ordered that evidence of defendant's criminal history would not be admitted and that the parties were to inform their witnesses of the court's orders. The prosecutor responded: "Your Honor, the state[ment] by Detective Bronte was inadvertent. I had no idea he would say something like that based off the question I had asked. It was immediately objected to, and the Court corrected it quickly, and asked the jury to stricken [*sic*] it. It was something that came and went. It was not touched upon or moved upon. [¶] I did not admonish Bronte because I thought, in no way did the motions in limine, or anything that we've ever talked about, would even apply to Bronte, in a sense that I didn't have any idea that he would volunteer information."

Following argument, the trial court denied the motion and stated: "The Court's perception of the events . . . is Officer Bronte volunteered this information. It really had not a lot to do with anything. The question was: Did you show him a photo lineup? Yes. I showed him a photo lineup of the mug shot from Juvenile Probation. . . . [¶] . . . The Court's point is that the response of Officer Bronte was not particularly responsive. It was volunteered. And I don't find misconduct on the part of [the prosecutor]. [¶] All of you agreed that the admonition that I gave to the jurors was acceptable. I specifically asked everybody yesterday . . . ."

### 2. *Analysis*

Defendant contends that the prosecutor should have anticipated that a mug shot could have been used in the photo lineup and thus the prosecutor committed

30

misconduct when he failed to ensure that Detective Bronte did not disclose prejudicial information regarding his juvenile history.

"'"It is, of course, misconduct for a prosecutor to '"intentionally elicit inadmissible testimony."'' [Citations.]" . . . However, a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated. [Citation.]'" (*People v. Tully* (2012) 54 Cal.4th 952, 1035.)

Here, the prosecutor did not attempt to elicit inadmissible testimony. He was questioning Detective Bronte about how he developed a photo lineup based on the information obtained during the investigation. When the detective was asked what the photo under No. 1 depicted, he volunteered that the photo was a mug shot taken by the juvenile probation department. Since the prosecutor did not ask the detective about the source of the photo or about defendant's criminal history, we are not convinced that the prosecutor committed misconduct by failing to anticipate that the detective would disclose where he obtained the photo. The prosecutor was merely seeking to establish that the photo Romero had chosen was defendant's photo. Thus, the prosecution did not engage in misconduct.

Defendant's reliance on *People v. Parsons* (1984) 156 Cal.App.3d 1165 is misplaced. In *Parsons*, the prosecutor intentionally and in bad faith questioned a police officer about the defendant's arrest for a crime unrelated to the charges, which the trial court had previously ruled inadmissible. (*Id*. at pp. 1170-1171, fn. 1.) The Court of Appeal held that the prosecutor committed misconduct. (*Id.* at p. 1171.) Unlike in *Parsons*, here, the detective's testimony was not responsive to the prosecutor's question.

Defendant also relies on *People v. Bentley* (1955) 131 Cal.App.2d 687 (*Bentley*).[7] However, *Bentley* is distinguishable from the case before us. In that case,

_____

[7] *Bentley*, *supra*, 131 Cal.App.2d 687 was overruled in *People v. White* (1958) 50 Cal.2d 428.

the prosecutor elicited testimony from a police officer about his interview of the defendant, who had been accused of molesting a child. (*Id.* at p. 689.) The officer concluded his testimony by stating that the defendant had previously been a suspect in a similar case. (*Ibid.*) The *Bentley* court stated: "It is obvious from the record that the police officer deliberately made the statement about defendant being a suspect in another case in 1942 with the idea in mind of prejudicing defendant. There can be no doubt that the statement was highly prejudicial. The district attorney knew, or should have known, the testimony the officer was going to give and should have warned him not to make the statement. Every prosecutor who offers a witness to testify to conversations with an accused should know what the witness will relate if given a free hand." (*Id.* at p. 690.) In contrast to *Bentley*, here, Detective Bronte's testimony was not responsive to the prosecutor's question and could not have been anticipated by him.

Defendant argues, however, that the inadmissible evidence was extremely prejudicial and the trial court erred when it denied the mistrial motion. He further argues that he was deprived of his right to a fair trial.

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

Several courts have held that references to a defendant's criminal record were not prejudicial. In *People v. Valdez* (2004) 32 Cal.4th 73, a detective, who was testifying about a witness's positive identification of the defendant, was asked how he had " 'managed' " to include the defendant's photograph in the photo lineup. (*Id.* at p. 123.) The detective explained that the witness had told police the murder victim and the defendant knew each other, " '[s]o at that time we felt we had a possible

32

suspect and we then *went to the jail* and found a mug photo and put it in this mug photo lineup.' " (*Ibid.*)  The California Supreme Court concluded that the "fleeting reference to 'jail' was not 'so outrageous or inherently prejudicial that an admonition could not have cured it.' " (*Ibid.*)  In *People v. Collins* (2010) 49 Cal.4th 175, the trial court excluded reference to the defendant's recent incarceration.  On redirect, the defendant's girlfriend "nonresponsively volunteered" that she had accumulated a $1,200 phone bill because he "would call every night collect *and he was in Susanville*."  "This was when *he was still in Susanville before he got out* in December." (*Id.* at pp. 185, 196-198, italics added.)  The California Supreme Court upheld the trial court's denial of the defendant's mistrial motion, holding that the remarks were "brief and ambiguous," and any prejudicial effect could be cured by an admonition. (*Id.* at pp. 198-199; accord, *People v. Avila* (2006) 38 Cal.4th 491, 572-574 [codefendant's volunteered remark that the defendant had "barely got[ten] out of prison" when the crimes occurred did not result in incurable prejudice]; *People v. Bolden* (2002) 29 Cal.4th 515, 554-555 [arresting officer's "very brief" and nonresponsive testimony about having obtained the defendant's address from the parole office did not irreparably damage the defendant's chance of receiving a fair trial].)  Similarly, here, any prejudicial effect of the detective's volunteered reference to defendant's mug shot taken by the juvenile probation department was cured by the trial court's admonition to the jury.

### F.    New Laws

Defendant contends that three new laws that took effect on January 1, 2022 apply to him and require reversal of the judgment.

#### 1.    Assembly Bill No. 333

Assembly Bill No. 333 (Stats. 2021, ch. 699) amended section 186.22, which defines both the crime of active participation in a criminal street gang (§ 186.22,

33

subd. (a)) and the criminal street gang enhancement (§ 186.22, subd. (b)).[8] Three of the changes made by Assembly Bill No. 333 narrowed the scope of section 186.22. First, all references to "benefit, promote, further, or assist" have been narrowed to require that "the common benefit is *more than reputational*," and the amended statute provides that "[e]xamples of a common benefit that are more than reputational . . . include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subds. (e)(1), (g), italics added.) The statute did not previously contain that limitation. Second, the definition of " 'criminal street gang' " has been narrowed to require that the group's "members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.) The definition previously could be satisfied by individual, rather than collective, activity. Third, the definition of a "pattern of criminal gang activity," which is part of the definition of a criminal street gang, has been narrowed to preclude the use of "[t]he currently charged offense . . . to establish the pattern of criminal gang activity." (§ 186.22, subd. (e)(2).) Under the previous version of the statute, the current offense could be used to establish the pattern.

Defendant contends, and the Attorney General concedes, that the narrowed definitions in the statute apply retroactively to him since the judgment in this case was not final when the amended statute took effect. We agree. When a statute is amended to "redefine, to the benefit of defendants, conduct subject to criminal sanctions," the "inference of retroactivity" to all nonfinal judgments under the "*Estrada* rule" applies unless the Legislature has clearly signaled its intent that the statute apply only

---

[8] Assembly Bill No. 333 also enacted section 1109, which requires bifurcation of gang enhancement allegations if requested by the defense and of any active participation count unless the other substantive counts "require gang evidence as an element of the crime."

prospectively. (*People v. Frahs* (2020) 9 Cal.5th 618, 628-629, 631-632; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301.) Retroactive application of such a statute requires remand where the jury was not required to make the findings required by the amended statute unless the Attorney General can establish that the absence of such findings was harmless beyond a reasonable doubt. (Cf. *People v. Figueroa* (1993) 20 Cal.App.4th 65, 72; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; *People v. Chiu* (2014) 59 Cal.4th 155, 167.)

In this case, the jury was not required to make the requisite findings under the narrowed definitions in the amended statute. The Attorney General does not attempt to demonstrate that the absence of these findings was harmless, and therefore the jury's findings on the gang enhancements and active participation count cannot be upheld.[9]

The prosecutor relied almost entirely on *the current offenses* to establish a pattern of criminal gang activity, and there was little if any evidence of *prior collective* criminal activity by RPL gang members. The prosecutor argued to the jury: "When you find Scott Conway guilty of Counts 4 and 5, those are two offenses that form a pattern of offenses that satisfies the pattern offense requirements of 186.22 of the Penal Code. Scott Conway's crimes, they happened on two separate occasions by him, himself, that's all I need to show to establish a pattern." The amended statute bars using the current offenses to establish a pattern and requires prior offenses to involve collective action. The jury instructions did not bar the jury from utilizing the current offense nor did the instructions require that pattern offenses involve collective activity. Instead, the jury instructions told the jury that pattern offenses could have been

---

[9] Defendant does not mention the active participation count, but the Attorney General recognizes that it too is impacted by the amendments to section 186.22 and must be vacated also.

committed "alone or together" and that the current offenses could be used to establish a pattern.

The prosecution also introduced evidence that the benefit to RPL was reputational to establish the gang benefit element. The prosecution's gang expert testified essentially that RPL benefited from the offenses because these offenses enhanced RPL's "stature." The jury instructions did not bar the jury from using reputational benefits to satisfy the gang benefit element.

Under these circumstances, as the Attorney General concedes, a remand is required for potential retrial of the gang enhancement allegations and the active participation count.[10]

### 2. *Assembly Bill Nos. 124 and 518*

Defendant contends that remand is also required for resentencing under the statutory amendments made by Assembly Bill No. 124 (Stats. 2021, ch. 695) and Assembly Bill No. 518 (Stats. 2021, ch. 441). Assembly Bill No. 124 amended the provisions concerning selection of a prison term from the triad of lower, middle, and upper terms to require a court to ordinarily impose the lower term, except under limited circumstances, if the defendant was under the age of 26 (as defendant was) when he or she committed the crime. (Stats. 2021, ch. 695, § 5, [§ 1170, subd. (b)(2)].) Assembly Bill No. 518 (Stats. 2021, ch. 441) amended section 654 to permit the court to choose the lesser punishment where an act is punishable by either a lesser or a greater punishment. The Attorney General concedes that these provisions are retroactive. Since our remand will necessarily result in resentencing (whether

---

[10] Although defendant largely frames the issue as an instructional error, he appears to ask that the gang enhancements "be reversed and the matter remanded *for resentencing*." (Italics added.) We do not interpret this offhand and unexplained assertion as an argument that he cannot be retried on the gang enhancements and the active participation count since he expressly concedes in the same brief that retrial of the gang enhancements is permitted even if insufficient evidence was originally presented to prove what is now legally required.

36

retrial takes place or not), the trial court will necessarily adhere to the law then in effect to the extent that it benefits defendant. We need not consider defendant's claim that the trial court erred in failing to afford him an ability to pay hearing before imposing certain fines and fees as the propriety of the imposition of any fines and fees will be considered anew at the inevitable resentencing hearing.

## V. DISPOSITION

The judgment is reversed, and the matter is remanded for possible retrial of the gang enhancement allegations and the active participation count. If the prosecutor elects not to retry those allegations and that count, the trial court shall resentence defendant on the remaining counts.

_____

ELIA, J.

WE CONCUR:


_____

GREENWOOD, P.J.


_____

BAMATTRE-MANOUKIAN, J.


*People v. Conway*
H044790